Filed 8/5/13  P. v. Zamora CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>      v.<br><br>JUAN ANTONIO ZAMORA,<br><br>    Defendant and Appellant. | G046664<br><br>(Super. Ct. No. 09NF2399)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Dan McNerney, Judge.  Affirmed.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Jennifer B. Truong, Deputy Attorneys General, for Plaintiff and Respondent.

Juan Antonio Zamora appeals from a judgment after a jury convicted him of four counts of committing a lewd act on a child under the age of 14 years and three counts of sexual penetration with a child 10 years of age or younger. Zamora argues: (1) insufficient evidence supports a finding of sexual penetration; (2) the trial court erred in admitting portions of the investigating detective's testimony; (3) the court failed to instruct the jury sua sponte on child sexual abuse accommodation syndrome (CSAAS); (4) the court erred in instructing the jury on unanimity; (5) he received ineffective assistance of counsel; and (6) there was cumulative error. We agree the court erred in admitting one portion of the detective's testimony but conclude Zamora was not prejudiced. None of his other contentions have merit, and we affirm the judgment.

FACTS

In 2008, four-year-old N.B. left Mexico and arrived in Santa Ana to live with her mother (Mother). Mother and Zamora, who met while working at El Pollo Loco, had been dating for two years. Mother and Zamora would often sleep at each other's residence, and when they did, Mother, N.B., and Zamora would share the same bed. During the first half of 2009, when N.B.'s mother worked, Zamora would babysit N.B.

One summer afternoon in 2009, five-year-old N.B. and her mother, who were both clothed, were asleep on top of the covers of Zamora's bed while Zamora took a shower. When Zamora finished his shower, he woke up Mother by leaning on her and kissing her, but Mother was tired and closed her eyes. When Mother opened her eyes, she saw Zamora use his hands to spread N.B.'s legs. Zamora put his hand through one of the leg holes of N.B.'s shorts and rubbed her pubic area. Mother stood up and sobbingly asked Zamora what he was doing. Zamora told her to be quiet and that she did not see

2

anything.  Mother and N.B. left.  Mother first took N.B. to the doctor and a few days later to the La Habra Police Station, where she told an officer what had occurred.[1]

A couple weeks later, social worker Maria Ochoa went to Mother's residence and spoke with N.B. alone.  Using a drawing, N.B. defined the body parts as follows:  breasts = "chichis"; vagina = "cositas" and "parte"; and buttocks = "pompis".  N.B. initially denied anyone touched her inappropriately.  She eventually disclosed Zamora had touched her cositas.  She stated Zamora used his finger to touch her cositas and put his finger inside her cositas.  Ochoa explained N.B. used the word "adentro," literally translated as "inside."  When Ochoa asked N.B. how many times Zamora had put his finger inside her vagina, N.B. answered, "Many times."  Ochoa said she ended the interview as required by protocol and arranged a interview with the Child Abuse Services Team (CAST).

Two weeks later, Mother spoke with Detective Dean Capelletti.  She showed Capelletti her cellular telephone and text messages Zamora had sent to her; Capelletti took photographs of the text messages.  They read as follows:  (1) "'I can't stop thinking about you guys.  Not one minute.  Every day.'"; (2) "'I'd ask you for forgiveness all my life if you would return to me[.]'"; (3) "'Did you throw my stuff away in the garbage?'"; and (4) " 'I feel like I'm dying little one.'"  After each of those text messages, Zamora included the emoticon, "☹".  Mother told Capelletti what she had observed Zamora doing to N.B.

---

[1]     The officer was unavailable to testify, and this evidence was introduced by way of a stipulation.

Mother made a covert telephone call to Zamora while Capelletti listened.[2] The following week, social worker Adrianna Ball of the Child Abuse Services Team (CAST) interviewed five-year-old N.B.[3] Capelletti and a prosecutor observed the interview from behind a one-way mirror. Ball showed N.B. a drawing of a girl. Based on the picture, N.B. again referred to breasts as "chichis", the pubic region as "cosita", and buttocks as "pompis". N.B. told Ball she came from Mexico when she was four years old and Zamora began touching her three to five months after she arrived. N.B. explained Zamora touched her "little part" with his hand on the outside and the inside more than 10 times and that it hurt. Ball responded, "Outside and inside? Okay, . . . okay." She said Zamora told her that if she resisted or told anyone, he would abandon her on the street. N.B. said Zamora touched her while they were in Zamora's bedroom, at her house, and in the garage at her house.

The same day, Dr. Van Nguyen Greco, a member of the CAST medical unit, examined N.B. Based on her observation of the CAST interview, Greco understood N.B. complained she had been digitally penetrated in her vagina and she experienced pain. Greco's examination of N.B. revealed no signs of injuries,[4] which could be explained by the fact there was no injury, the lapse of time, or the elasticity of the hymen.

---

[2] Based on our review of the record, it appears just a small portion of that recording was played for the jury, about the first 10 pages of the 93-page transcript. However, neither the compact disc nor the interview transcript were admitted into evidence. As we explain below, however, Capelletti testified regarding various statements Zamora made during the covert telephone call.

[3] A DVD of the interview was played for the jury. The prosecutor's exhibit No. 12A was transmitted to this court for our review. The interview was conducted in Spanish.

[4] Greco testified 96 percent of child sexual abuse cases have normal findings.

Greco could not confirm nor deny N.B. had been sexually abused, and her assessment was consistent with N.B.'s history of what transpired.

The following day, Capelletti interviewed Zamora.[5] Capelletti advised Zamora of his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436. When Capelletti finally confronted Zamora with N.B.'s accusations, Zamora eventually admitted he was attracted to N.B. and felt ashamed, but he did not know where to go for help. Zamora could not remember the first time he touched N.B., but he did feel guilty. He admitted anything she wore aroused him and she "provoked" him. Zamora admitted he touched N.B. more than five times but not more than 10 times. Zamora admitted he touched her pubic region on the skin with his hand, but he denied he put his finger inside her vagina. Zamora said he continued touching N.B. because she said it felt good and she liked it. He denied threatening her.

Capelletti and another detective interviewed N.B. N.B. stated Zamora touched her pubic region but denied he put his finger inside her vagina.

An amended information charged Zamora with four counts of committing a lewd act on a child under the age of 14 years (Pen. Code, § 288, subd. (a))[6] (counts 1, 3, 5, and 7), and three counts of sexual penetration with a child 10 years of age or younger (§ 288.7, subd. (b)) (counts 2, 4, and 6).

At trial, eight-year-old N.B. testified for the prosecution. When the prosecutor inquired, N.B. agreed she referred to her breasts as "chichis", buttocks as "pompis", and pubic region as "cosita". N.B. testified Zamora used his hand and fingers to touch her "front part" "many times" both at her house and Zamora's house. When the prosecutor asked N.B. whether Zamora "touch[ed] the part where [she] would go pee[,]"

---

5          A DVD of the interview was played for the jury.

6          All further statutory references are to the Penal Code, unless otherwise indicated.

5

N.B. replied, "Yes." She said it hurt her. Near the end of direct examination, the following colloquy occurred:

"[Prosecutor]: Would his hand be on your private part for a little while?

"[N.B.]: Yes.

"[Prosecutor]: And would it hurt while it was on your private part?"

"[N.B.]: Yes.

"[Prosecutor]: And was the part that hurt the part that you go pee?

"[N.B.]: Yes."

Capelletti testified concerning the contents of the covert telephone call. He stated that during the approximately 40-minute conversation, Zamora did not deny Mother's accusations. Capelletti said Zamora stated he was "sick" and "he couldn't control himself and that he needed help, but he didn't know where to get it." Capelletti stated Zamora repeatedly claimed he could not explain his conduct. He said Zamora denied doing similar things on other occasions.

Capelletti testified he observed N.B.'s CAST interview from behind a one-way mirror and he took notes during the interview. The following colloquy occurred:

"[Prosecutor]: Do you recall when you wrote your report regarding the details of your observations from the CAST interview?

"[Capelletti]: I'm sorry?

"[Prosecutor]: When did you write your report about the CAST interview?

"[Capelletti]: I believe I wrote it the next day.

"[Prosecutor]: And in writing your report, did you listen to the CAST interview again or did you use your notes or did you have a clear memory as to the central issues?

"[Capelletti]: I used my memory with some notes.

6

"[Prosecutor]: And in your documentation of the CAST interview, did you document [N.B.] stating Zamora's finger had penetrated her vagina on several occasions causing pain?

"[Defense counsel]: I have an objection. Directly contradicts the court's ruling yesterday. I guess it would be discovery.

"The court: [Prosecutor], when you say in your documentation, referring to [Capelletti's] notes of the interview?

"[Prosecutor]: I'm referring to [Capelletti's] police report page 28 of People's discovery. I'm sorry. If my phraseology in my last question was confusing, I can re-ask it with that specific --

"The court: All right. You can ask again.

"[Prosecutor]: . . . Capelletti, in your written report of the CAST interview, did you specifically document '[N.B.] said that Zamora's fingers had penetrated her vagina on several occasions causing pain'?

"[Defense counsel]: Objection. Also calls for an improper opinion, an ultimate decision of fact -- I'm sorry, a [*sic*] ultimate conclusion of law.

"The court: Overruled on those grounds. [¶] You may answer.

"[Capelletti]: I'm sorry. You are asking if that's what I put in my report?

"[Prosecutor]: Yes.

"[Capelletti]: Yes.

"[Prosecutor]: And in fact, that's exactly what you put.

"[Capelletti]: Yes.

"[Prosecutor]: And is that because that was your memory and your impression from the interview?

"[Capelletti]: Yes.

"[Prosecutor]: Did you also document in your report '[N.B.] stating that her vagina had been touched more than [10] times'?

7

"[Defense counsel]: Same objection. In addition, leading.

"[Capelletti]: Sustained as to leading.

"[Prosecutor]: In your report did you document how many times [N.B.] stated she had been touched?

"[Defense counsel]: Same objection.

"The court: Can you state the objection again, counsel?

"[Defense counsel]: Objection is discovery and --

"The court: Overruled on those grounds.

"[Defense counsel]: -- And al- --

"The court: What else?

"[Defense counsel]: Violation of the court's order yesterday with regard to the transcripts.

"The court: Overruled. [¶] You may answer.

"[Capelletti]: Yes.

"[Prosecutor]: Did you also document in your police report [N.B.'s] statement that it had happened at both Zamora's residence in his bedroom and also at her residence . . . [Mother's] house?

"[Defense counsel]: Same objection. Hearsay, leading.

"The court: Sustained as to leading."

After the prosecutor played the DVD of Capelletti's interview with Zamora for the jury, the prosecutor continued his direct examination of Capelletti questioning him about his interview strategies and his ultimate goal to obtain the truth.

The following colloquy occurred:

"[Prosecutor]: Your goal is to gather as much information as possible?

"[Capelletti]: Yeah. I just want the truth.

"[Prosecutor]: And at the -- at the end of your conversation with . . . Zamora, you said words to the extent that you hope that you have been successful in treating him like a man. Do you recall making that statement?

"[Capelletti]: Yes.

"[Prosecutor]: And then making the statement that he treated you like a man.

"[Capelletti]: Correct.

"[Prosecutor]: And I think you made [the] comment that there are some people that could come in and lie to your face and that you didn't view . . . Zamora as having done that.

"[Capelletti]: Correct.

"[Prosecutor]: Does that mean that you think . . . Zamora was completely honest with you during the interview?

"[Defense counsel]: Objection. Calls for speculation, relevance.

"The court: Overruled.

"[Defense counsel]: Leading.

"The court: Overruled.

"[Capelletti]: I think -- I mean, I think he was as honest as could be. Do I think there may be maybe some stuff he didn't tell me, I don't think it's been my experience that there's never been anyone who has been 100 percent completely honest. There are things that people keep close to the vest that they are too embarrassed to talk about regardless of how comfortable I make them feel."

Ochoa testified regarding her interview with N.B. as described above, including that Zamora put his finger inside N.B.'s vagina. On cross-examination, Ochoa conceded she did not write in her report that N.B. said Zamora put his finger inside her "cosita." Ochoa also admitted she did not write in her report N.B. use the word "adentro" to describe what Zamora did with his finger. On redirect examination, the prosecutor

9

asked, "And what you wrote in your report was that [N.B.] stated that [Zamora] touched her cosita referring to her vaginal area and that [N.B.] disclosed that [Zamora] had touched her with his hands making skin-to-skin contact and digitally penetrating her vagina?" Ochoa replied, "Yes." The prosecutor asked Ochoa whether that is what N.B. explained happened, and Ochoa again responded, "Yes."

After both sides rested, the trial court and counsel discussed jury instructions generally and specifically which unanimity instruction was proper. The prosecutor stated that after reviewing CALCRIM Nos. 3500 and 3501's use notes, the prosecutor believed the court should instruct the jury with CALCRIM No. 3501. Defense counsel responded that he was in agreement with the trial judge that CALCRIM No. 3500 was the proper instruction. After the court and the prosecutor discussed the relevant use notes, the prosecutor maintained CALCRIM No. 3501 should be given. Defense counsel repeated the court should instruct the jury with CALCRIM No. 3500. The court stated: "Okay. Well, I have to concede that the drafters of CALCRIM and their selection of use notes have succeeded in baffling me. I'm of the view that [CALCRIM No.] 3501 is an instruction that would appear, based on my reading of the instruction as well as the use notes, that if it's a situation where it's a continuous course of touching or continuous course of intercourse, where what appears to be in dispute is how many times it happened and over what period. As best I read the instruction, [CALCRIM No.] 3500 would apply to that scenario. As best I can read the use notes it appears to the court that when there is not only a dispute as to the number of times it occurred, but what occurred, that [CALCRIM No.] 3500 is the appropriate instruction and that's the one I'm going to give."

During closing argument, defense counsel conceded Zamora was guilty of counts 1, 3, 5, and 7. Counsel asserted what was in dispute were counts 2, 4, and 6, and whether there was sexual penetration.

10

The jury convicted Zamora of all the offenses.  After the trial court denied Zamora's motion for new trial, the court sentenced him to 15 years to life on count 2 and a consecutive term of six years on count 1 for a total prison term of 21 years.  The court imposed concurrent sentences on counts 4 and 6, and stayed the sentences on counts 3, 5, and 7 pursuant to section 654.

## DISCUSSION

### I.  Sufficiency of the Evidence-Penetration

Zamora argues there was insufficient evidence of penetration.  Not so.

"The standard of review for a sufficiency of the evidence claim is well established.  We review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  We presume in support of the judgment the existence of every fact that could reasonably be deduced from the evidence.  [Citation.]  We ask whether, after viewing the evidence in the light most favorable to the judgment, any rational trier of fact could have found the allegations to be true beyond a reasonable doubt.  [Citation.]  Unless it is clearly demonstrated that 'upon no hypothesis whatever is there sufficient substantial evidence to support [the verdict of the jury],' we will not reverse.  [Citation.]"  (*People v. Huynh* (2012) 212 Cal.App.4th 285, 304.)

Section 289, subdivision (k)(1), states, "'Sexual penetration' is the act of causing the penetration, however slight, of the genital or anal opening of any person or causing another person to so penetrate the defendant's or another person's genital or anal opening for the purpose of sexual arousal, gratification, or abuse by any foreign object, substance, instrument, or device, or by any unknown object."  A finger is a foreign object.  (§ 289, subd. (k)(2); *People v. Wilcox* (1986) 177 Cal.App.3d 715, 717.)

11

It is well established under the law that penetration, however slight, "'of the [victim's] external genital organs is sufficient to constitute sexual penetration and to complete the crime of rape even if the rapist does not thereafter succeed in penetrating into the vagina.'" (*People v. Quintana* (2001) 89 Cal.App.4th 1362, 1366 (*Quintana*), quoting *People v. Karsai* (1982) 131 Cal.App.3d 224, 232 [penetration of external genital organs such as labia majora and labia minora sufficient], overruled on other grounds in *People v. Jones* (1988) 46 Cal.3d 585, 600, fn. 8.) Thus, penetration of no more than the lips of the vagina is sufficient to constitute rape. (*People v. Esposti* (1947) 82 Cal.App.2d 76, 78.) Penetration may be proved by circumstantial evidence. (*People v. Minkowski* (1962) 204 Cal.App.2d 832, 837.)

Here, Zamora does not dispute that he touched N.B. inappropriately. The only issue is whether he sexually penetrated her. Based on the entire record before us, we conclude there was sufficient evidence for the jury to reasonably conclude sexual penetration occurred. Ochoa, the social worker who first interviewed N.B., testified N.B. told her that Zamora put his finger "adentro" her "cositas" many times. Evidence established adentro means inside and cosita means vagina. The jury watched a DVD of N.B.'s interview with CAST social worker Ball. N.B. told Ball that Zamora touched her cosita more than 10 times. Ball asked N.B., in Spanish, "But how? Look. If this is your little part, . . . did he touch you outside of your little part, or inside where the peepee comes out?" N.B. replied, "De afuera, o si donde *** adentro." This is translated as, "Outside, or yes, where *** inside." This evidence was sufficient for the jury to conclude sexual penetration occurred, i.e., that Zamora put his finger inside N.B.'s genital organs on numerous occasions.

Zamora attempts to undermine the jury's verdicts by highlighting the alleged problems with Ochoa's and Ball's testimony, and the fact N.B. subsequently told Capelletti that Zamora only touched the outside of her pubic area. Zamora complains Ochoa's investigation was tainted from the outset because the report she received was

12

erroneous and Ochoa failed to record pertinent details in her report. Zamora also complains that during the CAST interview, N.B.'s statements Zamora sexually penetrated her were too speculative and she likely misunderstood the terms "outside" and "inside" as it relates to female genitalia. Finally, Zamora notes the evidence was in such a state of equipoise that the prosecutor asked Capelletti to conduct a follow up interview, that during the interview, N.B. stated Zamora touched the "outside" of her pubic area, and there was no physical evidence confirming penetration.

We remind Zamora the resolution of conflicts and inconsistencies in testimony, even those within the testimony of the same witness, are to be resolved by the jury. (*People v. Koontz* (1959) 171 Cal.App.2d 633, 634.) Although N.B. did not tell the male Capelletti that Zamora put his finger "adentro" her "cosita," she did tell two female social workers he did. And we do not find it convincing the six-year-old N.B. could not state with precision that Zamora put his finger inside her as far as the hymen but not into the vagina. Zamora's reliance on *Quintana, supra,* 89 Cal.App.4th 1362, where the medical evidence established defendant's finger penetrated as far as the hymen, is misplaced as that case does not establish insufficiency of the evidence here. The jury heard evidence N.B. said Zamora put his finger inside her vagina multiple times and it hurt. This was sufficient evidence to support Zamora's convictions for counts 2, 4, and 6.

## II. Capelletti's Testimony

Zamora contends the trial court erred in admitting two portions of Capelletti's testimony. We will address each in turn.

## A. Impugning Zamora's Credibility

Zamora claims Capelletti's testimony concerning Zamora's honesty was improper opinion testimony. The Attorney General responds Zamora forfeited appellate review of this issue, and Capelletti was not offering his opinion. We conclude defense counsel's objection Capelletti's opinion on Zamora's credibility was speculative

13

preserved this issue for appellate review. As we explain below, we conclude the trial court erroneously admitted the testimony but Zamora was not prejudiced.

"'If a witness is not testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is: [¶] '(a) Rationally based on the perception of the witness; and [¶] '(b) Helpful to a clear understanding of his testimony.' (Evid. Code, § 800.) [¶] (4) 'Lay opinion about the veracity of particular statements by another is inadmissible on that issue. As the Court of Appeal recently explained [citation], the reasons are several. With limited exception, the fact finder, not the witnesses, must draw the ultimate inferences from the evidence. Qualified experts may express opinions on issues beyond common understanding (Evid. Code, §§ 702, 801, 805), but lay views on veracity do not meet the standards for admission of expert testimony. A lay witness is occasionally permitted to express an ultimate opinion based on his perception, but only where "helpful to a clear understanding of his testimony" [citations], i.e., where the concrete observations on which the opinion is based cannot otherwise be conveyed. [Citations.]' [Citation.]" (*People v. Smith* (1989) 214 Cal.App.3d 904, 914-915.)

*People v. Sergill* (1982) 138 Cal.App.3d 34 (*Sergill*), is instructive. In that case, defendant was charged with committing a sexual offense against his niece. The prosecutor asked one of the investigating officers whether he had formed an opinion as to whether the victim was telling the truth, and what was that opinion. (*Id.* at p. 38.) The officer testified that in his opinion, the victim was truthful, and explained that as a result of his dealings with many children he could usually determine with a high degree of accuracy whether their statements were true. The trial court overruled the defense's objection to this testimony saying, "this officer has had . . . seven years of experience, and has written . . . a thousand or more reports, . . . and I think [in] the course of that he would be normally expected to judge whether a person, in his opinion, is telling the truth or not." (*Ibid*.) The court also allowed another police officer who had also interviewed

14

the victim to express an opinion the victim was telling the truth when she reported her uncle had molested her. (*Ibid.*) The court held the veracity of those who report crimes to the police is not a proper subject of expert testimony; and, even if it were, the fact the officers had taken numerous reports during their careers would not qualify them as experts in judging truthfulness. (*Id.* at p. 39.) The court held, "Both these officers were able to describe their interviews with the girl in concrete detail and their opinions or conclusions as to her truthfulness were not 'helpful to a clear understanding of [their] testimony.' [Citation.] [¶] We also conclude that this opinion testimony was inadmissible because it was not relevant. [Citation.] . . . [¶] . . . [T]hese officers neither knew the child, nor knew her reputation for truthfulness. [Citation.] Instead, their conclusions that she was telling the truth were based on their own self-proclaimed expertise in assessing victim veracity, but the record is devoid of any evidence to establish their qualifications in this regard." (*Id.* at p. 40.)

Here, contrary to the Attorney General's contention otherwise, the prosecutor did seek Capelletti's opinion on Zamora's credibility, although not couched in the typical form of question typically used to obtain an opinion. The prosecutor asked Capelletti, "Does that mean that you think . . . Zamora was completely honest with you during the interview?" The prosecutor certainly wished to elicit Capelletti's opinion on whether Zamora was being honest during the interview, and the Attorney General's claim the prosecutor "appears to have been aimed at allowing . . . Capelletti to explain that his words to [Zamora] did not reflect a credibility assessment[]" is unpersuasive.

With respect to whether this was the proper subject of expert testimony, we conclude it was not. Like in *Sergill*, there is nothing in the record to support the conclusion Capelletti's experience investigating crimes and interviewing reporters of crimes qualifies him as an expert in judging truthfulness, and a defendant's veracity is not the proper subject of expert opinion. (*Sergill, supra,* 138 Cal.App.3d at p. 39; Evid. Code, § 720, subd. (a).) As to whether this was the proper subject of lay opinion, again

15

we conclude it was not. Again like in *Sergill*, the record includes no evidence Capelletti knew Zamora or knew his reputation for truthfulness. (*Sergill, supra,* 138 Cal.App.3d at p. 40.) Capelletti's opinion Zamora had not been "100 percent completely honest[]" was based on his experience but the record is void of any evidence establishing his expertise in this matter.

Having concluded the trial court erred in admitting Capelletti's opinion testimony as to Zamora's truthfulness, we must now examine the entire record to determine whether it was reasonably probable Zamora would have received a better result absent the erroneously admitted evidence. (*Sergill, supra,* 138 Cal.App.3d at p. 41.) We conclude any error was harmless because as we explain above there was sufficient evidence supporting the sexual penetration finding.

Although N.B. during trial and during her interview with Capelletti stated Zamora touched the outside of her pubic area, she told two female social workers Zamora put his finger insider her vagina more than 10 times and it hurt. Additionally, Capelletti's improper opinion testimony was an exceedingly minor factor in the trial. The jury watched a DVD of Capelletti's interview with Zamora and the trial court instructed the jury they "alone must judge the credibility or believability of the witnesses." (CALCRIM No. 226, "Witnesses.") Finally, Zamora's credibility was damaged beyond repair. During his interview with Capelletti, Zamora admitted he touched five-year-old N.B. and attempted to rationalize his conduct by stating *she said it felt good and she liked it*. Thus, Zamora was not prejudiced by the admission of Capelletti's testimony Zamora was not completely honest.

B. *Vouching for N.B.'s Credibility*

Zamora also claims Capelletti's testimony regarding what N.B. stated during her CAST interview was improper because the prosecutor's questions were leading and Capelletti's lay opinion testimony was hearsay, and alternatively his defense counsel was ineffective because counsel did not object to the testimony on those grounds.

16

The Attorney General again argues Zamora forfeited appellate review of this issue because he did not object on the proper grounds, and the prosecutor's questions were not leading and a hearsay exception applied. We agree Zamora forfeited appellate review of this issue because defense counsel did not object on the grounds the prosecutor was leading Capelletti or his testimony was hearsay. (*People v. Crandell* (1988) 46 Cal.3d 833, 879, fn. 14 [objection must be timely and proper], overruled on other grounds in *People v. Crayton* (2002) 28 Cal.4th 346, 364-365; *People v. Castaneda* (1975) 52 Cal.App.3d 334, 339 [defense counsel failed to object on specific grounds raised on appeal].) Instead, defense counsel objected on the grounds it was a discovery violation and improper opinion on an ultimate conclusion of law. It was not until later in response to other questions not concerning sexual penetration did defense counsel interject leading and hearsay objections. Thus, Capelletti's claims the prosecutor's questions were leading and Capelletti's testimony was hearsay are forfeited.

To the extent Zamora contends Capelletti offered an improper opinion, we disagree. The prosecutor asked Capelletti whether "in [his] written report of the CAST interview, did [he] specifically document '[N.B.] said that Zamora's fingers had penetrated her vagina on several occasions causing pain'?" Capelletti replied he did write that in his report. There are various objections defense counsel could have made to this foundational question, including that the question was compound and those now advanced on appeal.

Because we have concluded Zamora forfeited appellate review of the issue Capelletti essentially bolstered N.B.'s testimony because defense counsel did not object on the proper grounds, we must now address his claim counsel provided ineffective assistance of counsel.

"In order to establish a violation of the right to effective assistance of counsel, a defendant must show that counsel's performance was inadequate when measured against the standard of a reasonably competent attorney, and that counsel's

17

performance prejudiced defendant's case in such a manner that his representation 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' [Citations.] Moreover, 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.' [Citation.] Prejudice is shown when there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.] If defendant fails to show that he was prejudiced by counsel's performance, we may reject his ineffective assistance claim without determining whether counsel's performance was inadequate. [Citation.]" (*People v. Sanchez* (1995) 12 Cal.4th 1, 40-41, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390.)

Here, there is not a reasonable probability that but for defense counsel's failure to object on the now complained of grounds the result of the proceeding would have been different. As we explain above, there was sufficient evidence for the jury to reasonably conclude Zamora committed counts 2, 4, and 6. N.B. told Ochoa and Ball Zamora put his finger inside her vagina over 10 times and it hurt. The jury could properly rely on this evidence alone to convict Zamora of the counts 2, 4, and 6. The admission of Capelletti's testimony he wrote in his report N.B. told Ball Zamora put his finger inside her vagina was not prejudicial. Thus, defense counsel did not provide ineffective assistance of counsel.

III. *Limiting Instruction*

Zamora argues the trial court failed to instruct the jury sua sponte with CALCRIM No. 1193, "Testimony on Child Sexual Abuse Accommodation Syndrome." We disagree.

18

There are five stages to CSAAS: secrecy, helplessness, entrapment and accommodation, delayed disclosure, and retraction. (*People v. Bowker* (1988) 203 Cal.App.3d 385, 389 (*Bowker*); *In re Amber B.* (1987) 191 Cal.App.3d 682, 690, fn. 3.)

"It is beyond dispute that CSAAS testimony is inadmissible to prove that a molestation actually occurred. . . . [¶] Although inadmissible to prove that a molestation occurred, CSAAS testimony has been held admissible for the limited purpose of disabusing a jury of misconceptions it might hold about how a child reacts to a molestation. [Citations.] [¶] Identifying a 'myth' or 'misconception' has not been interpreted as requiring the prosecution to expressly state on the record the evidence which is inconsistent with the finding of molestation. It is sufficient if the victim's credibility is placed in issue due to the paradoxical behavior, including a delay in reporting a molestation. [Citations.]" (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744-1745.)

There is a split of authority in California whether a trial court has a sua sponte duty to instruct the jury on CSAAS testimony.[7] (*People v. Housley* (1992) 6 Cal.App.4th 947, 958-959 (*Housley*) [sua sponte instruction required]; *Bowker, supra,* 203 Cal.App.3d at p. 394 [same]; *People v. Stark* (1989) 213 Cal.App.3d 107, 116 [instruction necessary only upon request]; *People v. Sanchez* (1989) 208 Cal.App.3d 721, 735-736 [same], overruled on other grounds in *People v. Jones* (1990) 51 Cal.3d 294,

---

[7] CALCRIM No. 1193 provides: "You have heard testimony from _____ <insert name of expert> regarding child sexual abuse accommodation syndrome. [¶] _____'s <insert name of expert> testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against (him/her). [¶] You may consider this evidence only in deciding whether or not _____'s <insert name of alleged victim of abuse> conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of (his/her) testimony."

19

307; *People v. Bothuel* (1988) 205 Cal.App.3d 581, 587-588 [same], overruled on other grounds in *People v. Scott* (1994) 9 Cal.4th 331, 348.)

We need not decide whether a trial court has a sua sponte duty to instruct the jury on CSAAS because here Greco did not testify concerning CSAAS. We have reviewed Greco's testimony. She did not testify concerning CSAAS generally or CSAAS's five stages of secrecy, helplessness, entrapment and accommodation, delayed disclosure, and retraction. Thus, the court did not have a sua sponte duty to instruct the jury with CALCRIM No. 1193.

Zamora cites to the prosecutor's question concerning journal articles aimed at dispelling "certain myths . . . regarding female anatomy or . . . sexual penetration." He also cites to her testimony regarding studies on sexual penetration and the resulting medical findings. Zamora argues this testimony is analogous to CSAAS testimony. We disagree. CSAAS concerns *behaviors* that have been commonly observed in children who have experienced sexual abuse. Greco testified regarding the *physical injuries* resulting from sexual abuse. Based on the record before us, we conclude the trial court did not have a sua sponte duty to instruct the jury with CALCRIM No. 1193 where the expert witness did not testify concerning the psychological symptoms of CSAAS but instead only generally concerning the physical injuries a female may sustain when she is sexually abused.

In any event, any error in failing to provide such an instruction was harmless. (*Housley, supra,* 6 Cal.App.4th at p. 959 [applying standard under *People v. Watson* (1956) 46 Cal.2d 818, 836].) In addition to sufficient evidence of penetration as we describe above more fully, Greco's testimony was not particularly relevant, a point Zamora concedes.

Finally, because Greco did not testify concerning CSAAS and the trial court did not have a sua sponte duty to instruct the jury with CALCRIM No. 1193, we conclude defense counsel was not deficient for failing to request the instruction.

20

Moreover, it is not reasonably probable Zamora would have received a better result as the evidence was sufficient to support counts 2, 4, and 6, and Greco's testimony was as Zamora puts it, "only tangentially relevant."

## IV. Unanimity Instruction

The parties have changed their positions since trial. At trial, the prosecutor argued the trial court should instruct the jury on unanimity with CALCRIM No. 3501. Zamora contended the court should instruct the jury with CALCRIM No. 3500 and he never requested the court also instruct the jury with CALCRIM No. 3501.

The trial court instructed the jury with CALCRIM No. 3500.[8]

On appeal, Zamora now complains the court erred when it instructed the jury with CALCRIM No. 3500 and instead should have instructed the jury with CALCRIM No. 3501. The Attorney General argues the court properly instructed the jury with CALCRIM No. 3500 but assuming it was error, Zamora was not prejudiced.

Because Zamora agreed the trial court should instruct the jury with CALCRIM No. 3500, and never requested the trial court also instruct the jury with

---

[8] The trial court instructed the jury with CALCRIM No. 3500, "Unanimity," as follows: "The defendant is charged with [l]ewd [a]ct [u]pon a [c]hild [u]nder 14 and [s]exual [p]enetration with a [c]hild 10 [y]ears or [y]ounger in [c]ounts 2-7 sometime during the period of January 1, 2009[,] to July 10, 2009. [¶] The People have presented evidence of more than one act to prove that the defendant committed this offense. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed."

21

CALCRIM No. 3501,[9] Zamora has forfeited this claim. "'"A party may not complain on appeal that an instruction *correct in law* and *responsive to the evidence* was too general or incomplete unless the party has requested appropriate clarifying or amplifying language."'" (*People v. Hill* (1992) 3 Cal.4th 959, 997, italics added, overruled on other grounds by *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

Assuming it was error for the trial court to instruct the jury with CALCRIM No. 3500 instead of CALCRIM No. 3501, we conclude any error was harmless beyond a reasonable doubt. (*People v. Matute* (2002) 103 Cal.App.4th 1437, 1449 [noting split of authority as to proper standard of review].)

During closing argument, the prosecutor explained all the offenses occurred between January 1 and July 10 when N.B. was five years old. The prosecutor argued: "Now, as to the grouping of the counts. And there's a couple of different ways of looking at these events, but especial [*sic*] we're looking at four separate events. The event on July 11th and then as to counts 2 through 7, there's a first incident, there's a subsequent incident and there's a last incident during that time frame. That's one way of grouping it." A little later, the prosecutor added, "And then as to the different types of crime, and I will speak to the specific type of evidence, but just in terms of out shorthand, the [section] 288[.7][, subdivision] (b), that is the sexual penetration charge. The [section] 288[, subdivision] (a) is the lewd touching. Whenever someone sexually penetrates someone they also touched them in a lewd way. There is no way to sexually

---

[9]     CALCRIM No. 3501, "Unanimity: When Generic Testimony of Offense Presented," states: "The defendant is charged with _____ <insert description[s] of alleged offense[s]> [in Count[s] _____] sometime during the period of _____ to _____. [¶] The People have presented evidence of more than one act to prove that the defendant committed (this/these) offense[s]. You must not find the defendant guilty unless: [¶] 1. You all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act (he/she) committed [for each offense]; [¶] OR [¶] 2. You all agree that the People have proved that the defendant committed all the acts alleged to have occurred during this time period [and have proved that the defendant committed at least the number of offenses charged]."

penetrate a person without also committing the offense of a lewd act. Before he penetrates her he touches her. . . . So that is how our charges break up. Four distinct events."

Based on the prosecutor's arguments, the number of offenses charged against Zamora and the period of time at issue were clearly explained to the jury. As to counts 2 through 7, the prosecutor explained there was a first incident, a subsequent incident, and a last incident during the time frame in question. The prosecutor asserted that as to each of those three incidents, Zamora touched N.B. inappropriately *and* sexually penetrated her. The prosecutor explained to the jury the evidence supporting each of the offenses. Additionally, the trial court instructed the jury with CALCRIM No. 3515, "Multiple Counts: Separate Offenses," as follows: "Each of the counts charged in this case is a separate crime. You must consider each count separately and return a special verdict for each one." We reject Zamora's claim the jury concluded he committed *one* offense and based on the language in CALCRIM No. 3500, convicted him of all the offenses. Thus, we are certain beyond any reasonable doubt the jury understood it had to decide whether Zamora committed three counts of lewd touching and three separate counts of sexual penetration on three separate occasions.

*V. Ineffective Assistance of Counsel*

Zamora claims defense counsel provided deficient performance because he did not properly object to Capelletti's testimony, and counsel did not request the trial court instruct the jury with CALCRIM No. 1193. This claim requires no further discussion because we have either addressed the merits of his claim (Capelletti's testimony concerning Zamora's credibility), concluded Zamora was not prejudiced by counsel's failure to properly object (Capelletti's testimony regarding what N.B. stated), or addressed both the merits of his claim and his ineffective assistance of counsel claim (the appropriateness of CALCRIM No. 1193). In conclusion, it was not reasonably probable Zamora would have received a better result had defense counsel made the

23

proper objection or requested the trial court instruct the jury with CALCRIM No. 1193 because there was sufficient evidence of Zamora's guilt on counts 2, 4, and 6 in the form of N.B.'s complaints to social workers that Zamora put his finger inside her vagina and it hurt.

*VI. Cumulative Error*

Zamora contends the cumulative effect of the errors requires reversal. We have concluded there was one evidentiary error but Zamora was not prejudiced. Thus, his claim has no merit

## DISPOSITION

The judgment is affirmed.


O'LEARY, P. J.

WE CONCUR:


MOORE, J.


THOMPSON, J.